**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| H.S., a Minor, through her Guardian, J.S., individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No.1:20-cv-3007 |
| v. | ) ) | |
| BYTEDANCE, INC., TIKTOK, INC., BEIJING BYTEDANCE TECHNOLOGY CO. LTD, and MUSICAL.LY, | ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff H.S., a minor, through her Guardian J.S., ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), by and through her attorneys, brings the following Class Action Complaint ("Complaint") pursuant to Rule 23 of the Federal Rules of Civil Procedure, against Defendants BYTEDANCE, INC., TIKTOK, INC., BEIJING BYTEDANCE TECHNOLOGY CO. LTD., and MUSICAL.LY (collectively, "Defendants" or "TikTok"), and alleges the following based upon personal knowledge as to herself and her own actions, and, as to all other matters, allege, upon information and belief and investigation of her counsel, as follows:

### NATURE OF THE ACTION

1.      Defendants operate the social media platform TikTok (formerly Musical.ly), one of the most popular entertainment apps for mobile devices in the United States and the world.

2.      TikTok allows users to create and share 15-second videos - typically of people doing activities such as dancing, lip-syncing, and stunts - and boasts a fanbase of more than **one**

1

**billion** worldwide, the vast majority of whom are teenagers and children. *See* Sherisse Pham, The company that owns TikTok now has one billion users and many are outside of China, CNN Business (June 20, 2019), *available at* https://www.cnn.com/2019/06/20/tech/tiktok-bytedance-users/index.html.[1]

3.       The ultra-popular TikTok app allows user to upload and download content without registering with the app or creating an account. This process, while providing quick and easy access to TikTok content, allows individuals - such as minors - to use the app *before* they could possibly be given notice of, or provide consent to the privacy policies and terms of use.

4.       Most alarming, various features of the TikTok app, including its alleged "Face Swap" feature, automatically scan and collect user's biometric identifiers, even for users who have not created accounts. *See* Peter Suciu, TikTok's Deepfakes Just The Latest Security Issue For The Video Sharing App, Forbes (January 7, 2020), *available at* https://www.forbes.com/sites/petersuciu/2020/01/07/tiktoks-deepfakes-just-the-latest-security-issue-for-the-video-sharing-app/#707ead6970a2. *See also* Jesse Hirsh, New Platform, Old Problems: How TikTok Recreates the Regulatory Challenge that Came Before It, Canadian Centre for International Governance Innovation (May 18, 2020) *available at* https://www.cigionline.org/articles/new-platform-old-problems-how-tiktok-recreates-regulatory-challenges-came-it.

5.       TikTok accesses its users' data for various purposes, including tracking users by age, gender, location, operating system, and interest in order to attract marketing and ad sales. By collecting and filtering this user data, TikTok offers a sophisticated targeted ad and marketing platform that allows its ad clientele to hone into their target demographics with shocking precision.

---

[1] *See also* Maryam Moshin, 10 TikTok Statistics That You Need To Know in 2020, Oberlo (February 17, 2020), *available at* https://www.oberlo.com/blog/tiktok-statistics.

*See* Maria Mellor, Why is TikTok creating filter bubble based on your race?, Wired (February 28, 2020), a*vailable at* https://www.wired.co.uk/article/tiktok-filter-bubbles.

6.     Moreover, TikTok, the sister app of the Chinese app "Douyin," was founded and created in China and remains a largely Chinese operation. Recently, U.S. officials and legislatures have raised concerns with TikTok's close ties to China, and in turn, the Chinese government.

7.     In November of 2019, the New York Times reported that the United States government had opened a national security review of the 2017 acquisition of Musical.ly, the American predecessor of TikTok, by the Chinese company ByteDance based on concerns that data from TikTok was being shared with China. *See* Jack Nicas, Mike Isaac, and Ana Swanson, TikTok Said to Be Under National Security Review, The New York Times (November 1, 2019), *available at* https://www.nytimes.com/2019/11/01/technology/tiktok-national-security-review.html.

8.     In fact, the Department of Defense recently expressed concern over TikTok's "popularity with Western Users, and its ability to convey location, image and ***biometric data*** to its Chinese parent company, which is legally unable to refuse to share data to the Chinese Government," going so far as to issue an internal memo to encourage its employees to avoid installing the app. *See* Jason Aten, The Department of Defense Is Warning People Not to Use TikTok Over National Security Concerns, Forbes (January 9, 2020) (quoting internal memo) (emphasis added) *available at* https://www.inc.com/jason-aten/the-department-of-defense-is-warning-people-not-to-use-tiktok-over-national-security-concerns.html.

9.     In 2019, Douyin introduced the "in-video" search function, which allows users to filter for individuals using facial recognition. This function "allows users to highlight and search the platform for the face of a person within a video." *See* Jessica Rapp, In-video search: A new opportunity for influencer marketing on Douyin?, PR Week (November 6, 2019), *available at*

https://www.prweek.com/article/1664878/in-video-search-new-opportunity-influencer-marketing-douyin. While this function is not active in TikTok, Douyin users in China, or elsewhere, can perform in-video searches for Illinois citizens.

10. Biometrics are not relegated to esoteric corners of commerce. Many apps and companies – such as TikTok – have incorporated biometric applications into their products and services in the form of biometric authenticators or artificial intelligence, and into consumer products, including such ubiquitous consumer products as checking accounts and cell phones.

11. Unlike ID badges – which can be changed or replaced if stolen or compromised – facial geometry and voiceprints are unique, permanent biometric identifiers associated with each individual. This exposes Illinois citizens to serious and irreversible privacy risks. For example, if a database containing facial geometry or other sensitive, proprietary biometric data is hacked, breached, or otherwise exposed – like in the recent Clearview AI, Facebook/Cambridge Analytica, and Suprema data breaches – individuals have **_no_** means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information.

12. In 2015, a data breach at the United States Office of Personnel Management exposed the personal identification information, including biometric data, of over 21.5 million federal employees, contractors, and job applicants. U.S. Off. of Personnel Mgmt., *Cybersecurity Incidents* (2018), *available at* www.opm.gov/cybersecurity/cybersecurity-incidents.

13. An illegal market already exists for biometric data. Hackers and identity thieves have targeted Aadhaar, the largest biometric database in the world, which contains the personal and biometric data – including handprints, iris scans, and facial photographs – of over a billion Indian citizens. *See* Vidhi Doshi, *A Security Breach in India Has Left a Billion People at Risk of*

*Identity Theft*, The Washington Post (Jan. 4, 2018), *available at* https://www.washingtonpost.com/news/worldviews/wp/2018/01/04/a-security-breach-in-india-has-left-a-billion-people-at-risk-of-identity-theft/?utm_term=.b3c70259fl38.

14.     In January 2018, an Indian newspaper reported that the information housed in Aadhaar was available for purchase for less than $8 and in as little as 10 minutes. Rachna Khaira, *Rs 500, 10 Minutes, and You Have Access to Billion Aadhaar Details*, The Tribune (Jan. 4, 2018), *available at* http://www.tribuneindia.com/news/nation/rs-500-10-minutes-and-you-have-access-to-billion-aadhaar-details/523361.html.

15.     In August 2019, it was reported that South Korean biotechnology company Suprema experienced a hack of its Biostar 2 platform, which exposed the fingerprint and facial recognition data of over one million people to Israeli hackers. Chris Baraniuk, *Biostar Security Software 'Leaked a Million Fingerprints'*, BBC News (Aug. 14, 2019), *available at* https://www.bbc.com/news/technology-49343774.

16.     In the United States, law enforcement, including the Federal Bureau of Investigation and Immigration and Customs Enforcement, have attempted to turn states' Department of Motor Vehicles databases into biometric data goldmines, using facial recognition technology to scan the faces of thousands of citizens, all without their notice or consent. Drew Harwell, *FBI, ICE Find State Driver's License Photos Are a Gold Mine for Facial-Recognition Searches*, The Washington Post (July 7, 2019), *available at* https://www.washingtonpost.com/technology/2019/07/07/fbi-ice-find-state-drivers-license-photos-are-gold-mine-facial-recognition-searches/?noredirect=on&utm_term=.da9afb2472a9.

17.     This practice has been criticized by lawmakers. Some states, including Illinois, have refused to comply with law enforcement's invasive requests. *State Denying Facial*

*Recognition Requests*, Jacksonville Journal-Courier (July 9, 2019), *available at* https://www.myjournalcourier.com/news/article/State-denying-facial-recognition-requests-14081967.php.

18. Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*, specifically to regulate companies that collect, store and use Illinois citizens' biometrics.

19. Notwithstanding the clear and unequivocal requirements of the law, each Defendant disregards individuals' statutorily protected privacy rights and unlawfully collects, stores, disseminates, and uses individuals' biometric identifiers in violation of BIPA. Specifically, each Defendant has violated and continues to violate BIPA because they did not and continues not to:

    a. Properly inform H.S., by her legal guardian, and others similarly situated, in writing of the specific purpose and length of time for which their biometric identifiers were being collected, stored, and used, as required by BIPA;

    b. Publish a publicly available retention schedule and guidelines for permanently destroying H.S.'s biometric identifiers of other similarly-situated individuals, as required by BIPA;

    c. Receive a written release from H.S., by her legal guardian and others similarly situated to collect, store, disseminate, or otherwise use their biometric identifiers, as required by BIPA; and

    d. Obtain consent from H.S., by her legal guardian and others similarly situated to disclose, redisclose, or otherwise disseminate their biometric identifiers to a third party as required by BIPA.

20. Accordingly, Plaintiff, on behalf of herself as well as the putative Class, seeks an Order: (1) declaring that Defendants' conduct violates BIPA; (2) requiring Defendants to cease the unlawful activities discussed herein; and (3) awarding statutory damages to Plaintiff and the proposed Class.

**PARTIES**

21.     H.S. and her legal guardian J.S., were, at all times relevant, residents of the State of Illinois. H.S. was a minor under the age of 18 while using TikTok.

22.     Defendant ByteDance, Inc. is a Delaware corporation with its principal place of business in Palo Alto, California. ByteDance, Inc. also has an office and conducts business in Chicago, Illinois.

23.     Defendant TikTok, Inc. f/k/a Musical.ly, Inc. ("TikTok") is a California corporation with its principal place of business in Culver City, California. Defendant TikTok also maintains offices across the country, including Chicago. Musical.ly, Inc. merged into TikTok, Inc. in August of 2018.

24.     Defendant Musical.ly is a Cayman Island corporation with its principal place of business in Shanghai, China.

25.     Defendant Beijing ByteDance Technology Co. Ltd. ("Beijing ByteDance") is a privately held company headquartered in Beijing, China. Defendant Beijing ByteDance acquired Defendants Musical.ly and its subsidiary Musical.ly, Inc. in December 2017 before Musical.ly, Inc. became TikTok, Inc. Beijing ByteDance is the 100% owner of Defendant ByteDance, Inc.

**JURISDICTION AND VENUE**

26.     This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), (d)(5)(B) because the proposed Class has 100 or more members, the amount in controversy exceeds $5,000,000.00, and the parties are minimally diverse.

27.     Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events and omissions giving rise to the claims pleaded in this Complaint occurred within this District.

**FACTUAL BACKGROUND**

**I.     The Biometric Information Privacy Act.**

28.     In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS § 14/5(c). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing yet unregulated technology. *See* 740 ILCS § 14/5.

29.     In late 2007, a biometrics company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records – which, like other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who used the company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

30.     Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS § 14/5.

31.     Additionally, to ensure compliance, BIPA provides that, for <u>each</u> violation, the prevailing party may recover $1,000 or actual damages, whichever is greater, for negligent

violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS § 14/20.

32.     BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

a.   Informs the subject in writing that a biometric identifier or biometric information is being collected, stored and used;

b.   Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

c.   Receives a written release executed by the subject of the biometric identifier or biometric information.

*See* 740 ILCS § 14/15(b).

33.     Biometric identifiers include retina and iris scans, fingerprints and handprints, and – most importantly here – facial geometry and voiceprints. *See* 740 ILCS § 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id*.

34.     BIPA establishes standards for how companies must handle Illinois citizens' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS § 14/15(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for such disclosure. *See* 740 ILCS § 14/15(d)(1).

35.     BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS § 14/15(c)) and requires companies to

develop and comply with a written policy – made available to the public – establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS § 14/15(a).

36.     The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are biologically unique to the individual and, once compromised, an individual is at a heightened risk for identity theft and left without any recourse.

37.     BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometrics as well as protecting their rights to know the precise nature for which their biometrics are used and how they are being stored and ultimately destroyed. Unlike other statutes that only create a right of action if there is a qualifying data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

38.     Plaintiff, like the Illinois legislature, recognizes how imperative it is to keep biometric information secure. Biometric information, unlike other personal identifiers such as a social security number, cannot be changed or replaced if hacked or stolen.

**II.     Defendants Violate the Biometric Information Privacy Act.**

39.     By the time BIPA passed through the Illinois legislature in mid-2008, most companies who had experimented with using individuals' biometric data stopped doing so.

40.     However, Defendants failed to take note of the shift in Illinois law governing the collection, use, storage, and dissemination of biometric data. As a result, Defendants continue to collect, store, use and disseminate TikTok users' biometric identifiers in violation of BIPA.

41.     Unbeknownst to users, including those who have merely downloaded the app without creating a user profile, the TikTok app infiltrates users' devices and extracts facial geometry and voiceprints that Defendants use to track and profile users.[2]

42.     Deepfake, a software created by Defendant ByteDance, extracts biometrics in order to "superimpose your face onto any video, or any picture, or anything" says Richard Jackson, Cybersecurity Division Chief at Fort Knox. *See* Eric Pilgic, Army Cybersecurity: Social media platforms offer children exciting, frightening environments, U.S. Army (January 22, 2020), *available                                                                                                    at* https://www.army.mil/article/231909/army_cybersecurity_social_media_platforms_offer_childre n_exciting_frightening_environments.

43.     As clearly stated in TikTok's Privacy Policy, TikTok's user data is subsequently transferred and shared with servers located outside the United States including backup servers located in Singapore. *See* TikTok Privacy Policy as of January 1, 2020 (last accessed May 18, 2020), *available at* https://www.tiktok.com/legal/privacy-policy?lang=en. Further, prior to TikTok's 2019 privacy changes, American user data was shared stored and processed in the

---

[2] In addition to facial geometry and voiceprints, merely downloading TikTok gives Defendants access to a device's camera and microphone, as well as information from each device including, but not limited to: user-generated content, including videos and images sent through the apps and/or on the device; phone and social network contacts; the device's WiFi MAC address (i.e., media access control address);the device's International Mobile Equipment Identity ("IMEI") number; the user's International Mobile Subscriber Identity ("IMSI") number; the device ID; the device brand and model/version; the hardware serial number; the Advertising ID; mobile carrier information; network information; browsing history; cookies; metadata; and precise physical location, including based on SIM card, cell towers and/or GPS.

"United States of America, Singapore, Japan or [] China." *See*, Helen Ehrlich, TikTok is Scamming People & Stealing Information, Affinity (November 4, 2018), *available at* http://culture.affinitymagazine.us/tik-tok-is-scamming-people-stealing-information/.

44. Unfortunately, each Defendant fails to inform individuals of the purposes and duration for which it collects, stores, and uses their biometric identifiers; fails to inform individuals that they discloses or disclosed their biometric identifiers between and among each Defendant; fails to inform individuals that they maintain backup servers with biometric database(s) outside of Illinois; fails to inform individuals that their biometric identifiers are disclosed to currently unknown third parties, which host the biometric identifiers in their data centers; and, fails to obtain written releases from individuals before collecting their biometric identifiers, as required by BIPA.

45. In addition, Defendants profit from the use of individuals' biometric identifiers. Defendants extract users' biometric identifiers in order to precisely categorize target audiences for advertisers, thus maintaining a competitive advantage over other social media advertising platforms. In effect, Defendants have surreptitiously created an immense commercial database, consisting of millions, if not billions, of users' data - including H.S.'s unique and personally identifiable biometric identifiers - that can be used for further commercial advantage and other harmful purposes. *See* Reindhart Krause, TikTok Raises Profile As Digital Ad Rival to Snap, Facebook, Google, Investor's Business Daily (May 18, 2020) (discussing TikTok's rising popularity and stating that "big brands in digital advertising – such as restaurant chain Chipotle Mexican Grill (CMG), cosmetics firm Elf Beauty (ELF), Walmart (WMT) and Ralph Lauren (RL) — have experimented with ads on TikTok.") *available at* https://www.investors.com/news/technology/tik-tok-video-app-digital-advertising/.

46.     The TikTok app also allows users to sign into the apps through Facebook, Google, and Twitter – in turn allowing Defendants access to biometric identifiers stored in each individuals' social media accounts.

47.     By utilizing these biometric databases, TikTok maintains a competitive advantage over other social media apps and secures profits from its use of biometric data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA.[3]

48.     Defendants fail to publish a written, publicly-available policy identifying their retention schedule and guidelines for permanently destroying TikTok users' biometric data when the initial purpose for collecting or obtaining their biometrics is no longer relevant, as required by BIPA.

49.     The Pay by Touch bankruptcy that catalyzed the passage of BIPA, as well as the recent data breaches, highlights why such conduct – where individuals are aware that they are providing personal information, but not aware that biometric data that is being extracted, to whom is it shared, or for what purpose it is being used – is dangerous. That bankruptcy spurred Illinois citizens and legislators into realizing that it is crucial for individuals to understand when providing biometric identifiers, such as one's facial geometry or voiceprint, who exactly is collecting their biometric data, where it will be transmitted, for what purposes, and for how long. Defendants disregard these obligations and their users' rights and instead unlawfully collect, store, use and disseminate their users' biometric identifiers and information, without first receiving the individual's informed written consent required by BIPA.

---

[3] *See* Lauren Strapagiel, This Researcher's Observation Shows the Uncomfortable Bias of TikTok's Algorithm, Buzzfeed News (February 26, 2020), *available at* https://www.buzzfeednews.com/article/laurenstrapagiel/tiktok-algorithim-racial-bias

50.     Remarkably, Defendants have created the same situation that Pay by Touch did by assembling a database of biometric data through broadly collecting biometric identifiers but failed to comply with the law specifically designed to protect individuals whose biometrics are collected in these circumstances. Defendant disregards these obligations and Illinois TikTok users' statutory rights and instead unlawfully collects, captures, obtains, stores, uses, and disseminates individuals' biometric identifiers and information without ever receiving the individual's informed written consent as required by BIPA.

51.     What's worse, having become ubiquitous among teenagers and children alike, TikTok puts *millions* of children's biometric information at risk, without the consent or knowledge of their parents or guardians.

52.     Defendants lack retention schedules and guidelines for permanently destroying H.S.'s biometric identifiers or the biometric identifiers of other similarly-situated individuals, when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the user's last interaction with the app.

53.     Defendants do not advise H.S. or her guardian, and others similarly situated, or their respective parents or legal guardians, what might happen to the TikTok user's biometric identifiers if and when Defendants merge with another company, or worse, if and when Defendants' businesses fold, or when the other third parties that have received TikTok users' biometric data businesses fold.

54.     Because Defendants neither publish a BIPA-mandated data retention policy nor disclose the purposes for their collection and use of biometric identifiers, TikTok users have no idea whether Defendants sell, disclose, redisclose, or otherwise disseminate their biometric data. Moreover, H.S., her legal guardian, and others similarly situated are not told to whom Defendants

14

disclose TikTok user's biometric data, or what might happen to the TikTok user's biometric data in the event of a merger or a bankruptcy.

55.     Notably, former Musical.ly users who accessed the app prior to its consolidation with the current TikTok app have no idea to whom Musical.ly disclosed their biometric data or what third parties may have accessed their biometric data as a consequence of this consolidation.

56.     These violations raise a material risk that H.S.'s biometric identifiers and the biometric identifiers of other similarly-situated individuals will be unlawfully accessed by third parties.

57.     By and through the actions detailed above, Defendants disregard Plaintiff's and other similarly-situated individuals' legal rights in violation of BIPA.

### III.     Plaintiff H.S.'s Experience

58.     Plaintiff H.S., an Illinois minor, downloaded the TikTok app onto her mobile device on or about May 11, 2019. Initially, H.S. was not required to disclose information about her age, nor was she required to enter a written release before receiving a TikTok account.

59.     Upon download, TikTok automatically created an account for her. Shortly after completing the download of the TikTok app onto her mobile device, H.S. made approximately five or six videos using the TikTok app on her mobile device.

60.     After shooting each video, H.S. (i) sometimes pressed the "next" button and (ii) sometimes pressed the "x" button and then the "reshoot" button. H.S. pressed "x" or saved approximately 50 videos, "reshot" others, and posted approximately 15 videos. As a result of sometimes pressing the "next" button, Defendants acquired some of H.S.'s videos without H.S.'s knowledge or consent, or the knowledge or consent of her guardian.

61.     During the time that the TikTok app was installed on H.S.'s mobile device, Defendants surreptitiously accessed and acquired her videos, extracting her facial geometry and voiceprint as well as the facial geometry and voiceprints of those in her videos. TikTok used the extracted facial geometry and voiceprints to profile and track H.S., as well as those whose facial geometry and/or voiceprints were shared in her videos.

62.     Defendants shared H.S.'s biometric identifiers without her or her legal guardian's knowledge or consent.

63.     H.S. has continuously and repeatedly been exposed to the risks and harmful conditions created by Defendants' multiple violations of BIPA alleged herein.

64.     No amount of time or money can compensate H.S. if her biometric identifiers are compromised by the lax procedures through which Defendants captured, stored, used, and disseminated her and other similarly-situated individuals' biometrics. Moreover, H.S. would not have provided her biometric identifiers to Defendants, and her legal guardian would not have consented to her use of TikTok, had they known that Defendants would retain such information for an indefinite period of time without consent.

65.     A showing of actual damages is not necessary in order to state a claim under BIPA. *See Rosenbach v. Six Flags Ent. Corp*., 2019 IL 123186, ¶ 40 ("[A]n individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under the Act, in order to qualify as an "aggrieved" person and be entitled to seek liquidated damages and injunctive relief pursuant to the Act").

66.     As Plaintiff is not required to allege or prove actual damages in order to state a claim under BIPA, she seeks statutory damages under BIPA as compensation for the injuries caused by Defendants. *Rosenbach*, 2019 IL 123186, ¶ 40.

## CLASS ALLEGATIONS

67.     Pursuant to Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure, minor Plaintiff H.S. through her legal guardian, J.S., brings claims on her own behalf and as a representatives of all other similarly-situated individuals pursuant to BIPA, 740 ILCS § 14/1, *et seq.*, to recover statutory penalties, prejudgment interest, attorneys' fees and costs, and other damages owed.

68.     As discussed *supra*, Section 14/15(b) of BIPA prohibits a company from, among other things, collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's or a customer's biometric identifiers or biometric information, unless it ***first*** (1) informs the individual in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the individual in writing of the specific purpose(s) and length of time for which a biometric identifier or biometric information is being collected, stored, and used; ***and*** (3) receives a written release executed by the subject of the biometric identifier or biometric information. 740 ILCS § 14/15.

69.     Plaintiff seeks class certification for the following class of similarly-situated individuals under BIPA:

> All individuals in Illinois under the age of 18 who had their facial geometry, voiceprint, or other biometric identifier collected, captured, received, or otherwise obtained, maintained, stored or disclosed by Defendants during the applicable statutory period.

70.     This action is properly maintained as a class action under Rule 23 because:

    A.     The class is so numerous that joinder of all members is impracticable;

    B.     There are questions of law or fact that are common to the class;

    C.     Plaintiff's claims are typical of the claims of the class; and,

    D.     Plaintiff will fairly and adequately protect the interests of the class.

**Numerosity**

71.     The total number of putative class members exceeds one hundred (100) individuals. The exact number of class members can easily be determined from Defendants' records.

**Commonality**

72.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiff and all members of the Class have been harmed by Defendants' failure to comply with BIPA. The common questions of law and fact include, but are not limited to the following:

A.      Whether Defendants collected, captured, maintained, stored or otherwise obtained Plaintiff's and the Class's biometric identifiers or biometric information;

B.      Whether Defendants properly informed Plaintiff and the Class of their purposes for collecting, using, storing and disseminating their biometric identifiers or biometric information;

C.      Whether Defendants properly obtained a written release (as defined in 740 ILCS § 14/10) to collect, use, store and disseminate Plaintiff's and the Class's biometric identifiers or biometric information;

D.      Whether Defendants have disclosed or redisclosed Plaintiff's and the Class's biometric identifiers or biometric information;

E.      Whether Defendants have sold, leased, traded, or otherwise profited from Plaintiff's and the Class's biometric identifiers or biometric information;

F.      Whether Defendants developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction with the individual, whichever occurs first;

G.      Whether Defendants comply with any such written policy (if one exists);

H.      Whether Defendants' violations of BIPA have raised a material risk that Plaintiff's and the putative Class' biometric data will be unlawfully accessed by third parties;

I.     Whether Defendants used Plaintiff's and the Class's facial geometry to identify them;

J.     Whether Defendants used Plaintiff's and the Class's voiceprints or other biometric identifiers to identify them;

K.     Whether the violations of BIPA were committed negligently; and

L.     Whether the violations of BIPA were committed intentionally or recklessly.

73.    Plaintiff anticipates that Defendants will raise defenses that are common to the class.

## Adequacy

74.    Plaintiff will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiff and class members. Plaintiff, moreover, has retained experienced counsel who are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

## Typicality

75.    The claims asserted by Plaintiff are typical of the class members she seeks to represent. Plaintiff has the same interests and suffers from the same unlawful practices as the class members.

76.    Upon information and belief, there are no other class members who have an interest individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation on behalf of minors. However, if any such class member should become known, he or she can "opt out" of this action pursuant to Rule 23(b)(3).

## Predominance and Superiority

77.    The common questions identified above predominate over any individual issues,

which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

78.     Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendants and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to fashion methods to efficiently manage this action as a class action.

## FIRST CAUSE OF ACTION

### Violation of 740 ILCS § 14/15(a): Failure to Institute, Maintain and Adhere to Publicly-Available Retention Schedule

79.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

80.     BIPA mandates that companies in possession of biometric data establish and maintain a satisfactory biometric data retention – and, importantly, deletion – policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the

company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS § 14/15(a).

81. Defendants fail to comply with these BIPA mandates.

82. Defendants qualify as "private entities" under BIPA. *See* 740 ILCS § 14/10.

83. Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendants (in the form of their facial geometry or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

84. Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

85. Defendants failed to publish a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information as specified by BIPA. *See* 740 ILCS § 14/15(a).

86. Upon information and belief, Defendants lack retention schedules and guidelines for permanently destroying Plaintiff's and the Class's biometric data and have not and will not destroy Plaintiff's or the Class's biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of the individual's last interaction with the app.

87. On behalf of herself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to

740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

## SECOND CAUSE OF ACTION
**Violation of 740 ILCS § 14/15(b): Failure to Obtain Informed Written Consent and Release Before Obtaining Biometric Identifiers or Information**

88.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

89.     BIPA requires companies to obtain informed written consent from individuals before acquiring their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] first: (1) informs the subject…in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and (3) receives a written release executed by the subject of the biometric identifier or biometric information…" 740 ILCS § 14/15(b) (emphasis added).

90.     Defendants fail to comply with these BIPA mandates.

91.     Defendants qualify as "private entities" under BIPA. *See* 740 ILCS § 14/10.

92.     Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendants (in the form of their facial geometry or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

93.     Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

94. Defendants systematically and automatically collected, used, stored and disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS § 14/15(b)(3).

95. Defendants did not inform Plaintiff and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, used and disseminated, nor did Defendants inform Plaintiff and the Class in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, used, and disseminated as required by 740 ILCS § 14/15(b)(1)-(2).

96. By collecting, storing, and using Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendants violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS § 14/1, *et seq*.

97. On behalf of herself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3).

### THIRD CAUSE OF ACTION
### Violation of 740 ILCS § 14/15(d): Disclosure of Biometric Identifiers and Information Before Obtaining Consent

98. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

99.     BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS § 14/15(d)(1).

100.    Defendants fail to comply with this BIPA mandate.

101.    Defendants qualify as "private entities" under BIPA. *See* 740 ILCS § 14/10.

102.    Plaintiff and the Class are individuals who have had their "biometric identifiers" collected by Defendants (in the form of their facial geometry or voiceprints), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS § 14/10.

103.    Plaintiff's and the Class's biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS § 14/10.

104.    Defendants systematically and automatically disclosed, redisclosed, or otherwise disseminated Plaintiff's and the Class's biometric identifiers and/or biometric information without first obtaining the consent required by 740 ILCS § 14/15(d)(1).

105.    By disclosing, redisclosing, or otherwise disseminating Plaintiff's and the Class's biometric identifiers and biometric information as described herein, Defendants violated Plaintiff's and the Class's rights to privacy in their biometric identifiers or biometric information as set forth in BIPA. *See* 740 ILCS § 14/1, *et seq.*

106.    On behalf of herself and the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendants to comply with BIPA's requirements for the collection, storage, use and dissemination of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA

pursuant to 740 ILCS § 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation

expenses pursuant to 740 ILCS § 14/20(3).

## PRAYER FOR RELIEF

Wherefore, Plaintiff H.S., through her guardian J.S., respectfully requests that this Court

enter an Order:

A.  Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff H.S., through her guardian J.S., as Class Representative, and appointing Stephan Zouras, LLP, as Class Counsel;

B.  Declaring that Defendants' actions, as set forth above, violate BIPA;

C.  Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS § 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS § 14/20(1);

D.  Declaring that Defendants' actions, as set forth above, were intentional and/or reckless;

E.  Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and the Class, including an Order requiring Defendants to collect, store, use and disseminate biometric identifiers and/or biometric information in compliance with BIPA;

F.  Awarding Plaintiff and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS § 14/20(3);

G.  Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and,

H.  Awarding such other and further relief as equity and justice may require.

Date:  May 20, 2020                                    Respectfully Submitted,

                                                      /s/ James B. Zouras
                                                      James B. Zouras
                                                      Ryan F. Stephan
                                                      Andrew C. Ficzko

Megan E. Shannon
**STEPHAN ZOURAS, LLP**
100 N. Riverside Plaza,
Suite 2150
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
rstephan@stephanzouras.com
jzouras@stephanzouras.com
aficzko@stephanzouras.com
mshannon@stephanzouras.com

Erik H. Langeland (*pro hac vice forthcoming*)
733 Third Avenue, 15th Floor
New York, N.Y. 10017
(212) 354-6270
elangeland@langelandlaw.com

Jon A. Tostrud (*pro hac vice forthcoming*)
TOSTRUD LAW GROUP, P.C.
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
(310) 278-2600
jtostrud@tostrudlaw.com

**ATTORNEYS FOR PLAINTIFF**